# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MELVIA HODGES for M.H.** | **CIVIL ACTION** |
| **VERSUS** | **NO: 10-2769-JCZ-SS** |
| **MICHAEL J. ASTRUE, COMMISSIONER**<br>**OF SOCIAL SECURITY** | |

## FINDINGS AND RECOMMENDATION

Plaintiff, M.H., by and through his next friend and mother, Melvia Hodges ("Ms. Hodges"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. § 1382(c).

## PROCEDURAL HISTORY

On November 5, 2008, the plaintiff applied for SSI.[1]  Ms. Hodges reported that the plaintiff's disability began on July 1, 2005.  R. 87-89.  The disability report described plaintiff as suffering from asthma and behavior problems.  R. 91.  On December 30, 2008, the plaintiff's application was denied.  R. 55-58.  On August 24, 2009, the plaintiff employed counsel.  R. 77-78.  On September 15, 2009, there was a hearing before an Administrative Law Judge ("ALJ").  R. 26-52.  On November 3, 2009, the ALJ issued an unfavorable decision.  R. 9-25.  On June 21, 2010, the

---

[1]  The record indicates that there was a prior application, but it is not in the record.  MH was seen for consultative examinations on January 7, 2008 and February 18, 2008.  R. 205-09 and 211-12.  On May 7, 2008, Mrs. Hodges asked to appeal an adverse decision.  She reported that his school had done more testing.  R. 225.

Appeals Council denied plaintiff's request for review of the ALJ's decision. R. 1-3. On August 17, 2010, Ms. Hodges filed a complaint on behalf of plaintiff. Rec. doc. 1. The parties filed cross-motions for summary judgment. Rec. docs. 12 and 13. Plaintiff is represented by counsel in federal court.

## STATEMENT OF ISSUES

1. Did the ALJ err in failing to find that MH's condition met or equaled a listing impairment?

2. Did the ALJ err in failing to find a marked impairment in the domain of attending and completing tasks?

## ALJ' S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issues on appeal:

1. MH was born on January 7, 1998. He was a school-age child on November 5, 2008, the date the application was filed, and was a school-age child on the date of the decision (20 CFR 416.926a(g)(2)).

2. MH has not engaged in substantial gainful activity since November 5, 2008, the application date (20 CFR 416.924(b) and 416.971 *et. seq.*).

3. MH has the following severe impairment: Attention Deficit Hyperactivity Disorder ("ADHD") and a history of asthma, impairments causing symptoms with limitations or restrictions having more than a minimal effect on his ability to do basic, function-related activities, (Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985); SSR 96-3p; and 20 CFR 416.924(c)).

4. MH does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. MH does not have an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926a).

6. MH has not been disabled, as defined in the Social Security Act, since November 5, 2008, the date the application was filed (20 CFR 416.924(a)).

R. 15 and 24.

## ANALYSIS

### a.   Standards of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Boyd v. Apfel, 239 F.3d 698, 704 (5th Cir. 2001); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Audler v. Astrue, 501 F.3d 446, 447 (5th Cir. 2007).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  This court may not reweigh the evidence, try the issues de novo or substitute its judgment for the Commissioner's.  Id.; Audler, 501 F.3d at 447.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990); Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

The issue is whether the claimant is "disabled" under the definition found in 42 U.S.C. § 1382c(a)(3)(C) which states:

An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

Id. The regulations thereunder mandate the following three step analysis:

We follow a set order to determine whether you are disabled. [Step One] If you are doing substantial gainful activity, we will determine that you are not disabled and not review your claim further. [Step Two] If you are not doing substantial gainful activity, we will consider your physical or mental impairment(s) first to see if you have an impairment or combination of impairments that is severe. If your impairment(s) is not severe, we will determine that you are not disabled and not review your claim further. [Step Three] If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals in severity any impairment that is listed in appendix 1 of subpart P of part 404 of this chapter. If you have such an impairment(s), and it meets the duration requirement, we will find that you are disabled. If you do not have such an impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled.

20 C.F.R. § 416.924(a). If a claimant's impairment does not meet or medically equal in severity a listed impairment, the Commissioner considers how the child functions in terms of six domains.[2] There will be a finding of functional equivalence if there are marked limitations in two of the domains, or an extreme limitation in one domain. 20 C.F.R. § 416.926a(d).

**b.**     **Testimony before the ALJ.**

MH provided his address, telephone number and date of birth. R. 31-32. He had four brothers and one sister. R. 42. He was the second to last of the six children. R. 43.

MH was eleven at the time of the hearing. R. 32. He was in the fifth grade at Hazel Park school. R. 32. School was going well. R. 32. His three favorite foods were Chinese rice, double

---

[2] The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well being. 20 C.F.R. § 416.926a(b)(1).

hamburgers and pizza.  R. 32-33.  The food at school was terrible.  R. 33.  Ms. Roberts taught him reading, English and Spanish.  Ms. Perez, his home room teacher, taught him social studies, English, reading and spelling.  Ms. Lulei taught him math.  R. 34.  Math was his favorite subject.  R. 37.

MH watched sports on TV.  His favorite sports were football and basketball.  R. 38.  He liked the Colts because they were good.  R. 38.  He helped his mother by cleaning the room and the bathroom.  R. 40-41.  He had to be reminded to do his chores.  R. 43.  He was able to fix food.  He prepared noodles in the microwave.  R. 41.

MH talked to friends at school.  R. 34.  He got into a fight the year before and was suspended.  R. 34-35.  He was outside at recess.  The ball was coming toward him.  He ran and caught the ball and fell on a "dude" and they started fighting.  R. 35.

MH took medicine for his behavior.  R. 36.  He went to a doctor every other week.  R. 39.  A couple of months before the hearing, he wrote "M Dog" on a seat on the school bus.  R. 39.  The "M" stood for his first name.  R. 40.  His mother was required to pay for the seat, so he had to do chores to pay for it.  R. 40.  He got in some trouble for disrupting the class when he was in school in Mississippi.  R. 41-42.  He denied being nervous, but said that his foot moved all of the time.  R. 42.  When he moved from his chair in school, his teachers became angry.  R. 42.

Ms. Hodges said that MH and his six year old brother went at it all the time.  R. 44.  Although he was responsible for cleaning the bedroom and the bathroom, he had to be reminded all the time.  R. 44.  He had to be told several time to do his chores, but his siblings knew their daily chores.  R. 44.  He was in special education at school with some accommodations.  R. 45.  The day before the hearing, his teacher called to report that he was teasing a child.  R. 47.

Ms. Hodges took MH to Kid First, which prescribed medication.  He was referred to the

LSUHSC Cajen Clinic ("Cajen"). R. 48. At Cajen he received medication and help from a social worker. R. 48. His first medication was Concerta; it was changed to Methylin; and at the time of the hearing he was on Adderall. R. 48. Ms. Hodges reported that he was doing well on Adderall, except for his sleeping. When it wore off, he did not sleep. He was not getting enough sleep with Adderall. R. 49. The social workers taught Ms. Hodges to reward him for good behavior. He was doing well with this. R. 49. He tended to blame others for his bad behavior. R. 50. At school he wanted to be in charge and do what he wanted to do. R. 50. He liked to play football and watch football. R. 50. He did not get along well with children in the neighborhood. R. 50. He was rewarded with Chinese food. R. 51.

**c.**    **Medical Records.**

On December 13, 2007, MH was seen at Children's Hospital. It was noted that he was having behavior problems which caused him to be suspended from school the week before. He used a nebulizer machine for asthma and was hospitalized in August for asthma exacerbations. He was to return in one week. R. 197.

On January 7, 2008, a Vanderbilt assessment was completed by Ms. Hodges. MH was not on medication. She indicated that most of the symptoms occurred very often. She indicated that he talked too much and blamed others for his mistakes or misbehaviors. R. 198.

On January 7, 2008, Thomas M. Welsh, Ph.D., performed a consultative psychological examination of MH. ADHD symptoms were evident. When he arrived for the examination, he had not taken his medication (Concerta 18 mg daily). R. 205-209. On January 11, 2008, he returned for a test. He was on his medication. He had a full scale IQ score of 79, placing overall intellectual performance in the borderline intellectual functioning to average range within the normative age

sample.  R. 207.  The prognosis was guarded to fair.  He demonstrated symptoms and characteristics of ADHD by history and by observation.  Dr. Welsh recommended training in techniques of behavior self-control and medication.  R. 209.

On February 18, 2008, Gary F. Carroll, M.D., performed a consultative physical examination.  He diagnosed MH with: (a) reactive airway disease which was under follow up treatment; and (b) ADHD which was under treatment and control.  R. 211-12.

On March 5, 2008, Henry Simon, M.D., and Charlotte Ducote, Ph.D., non-examining consultants, completed a Childhood Disability Evaluation Form, which indicated MH's ADHD and asthma were severe, but did not meet, medically equal, or functionally equal the Listings.  R. 213-14.

On April 2, 2008, Mrs. Hodges requested a "504 Plan" based on the ADHD diagnosis.  R. 226-27.  On April 2, 2008, it was noted that MH appeared to be responding to medication and was not showing behavior concerns.  The plan was to be reviewed in one year.  R. 229.  The plan evaluation was completed at MH's school.  R. 230.

On October 16, 2008, Mrs. Hodges completed a Vanderbilt assessment.  R. 202-03.

On November 4, 2008, MH was seen at Children's Hospital.  He was on Concerta 36 mg. R. 200.

On November 14, 2008, a social worker at the New Orleans Adolescent Hospital completed an assessment.  R. 304-313.  It was recommended that MH be educated in coping skills and impulse control techniques.  He and his parent were to be educated on diagnosis, triggers for relapse, recovery criteria for discharge and the importance of treatment compliance.  R. 313.  MH was described as alert, orientated with pleasant affect.  Eye contact was positive.  He was neatly dressed

and groomed.  There were problems at school.  He had been suspended.  He talked back to teachers.

He bullied his peers.  He was eager to please his mother, but he seemed to distrust his stepfather.

It was clear that reading was difficult for him.  The impression was ADHD, ODD v. Impulse

Control, Adjustment Disorder, possible Learning Disability, and a GAF of 65.  R. 312.

On November 21, 2008, he was seen at Cajen.  His Concerta was increased to 54 mg.  His

behavior was hyper and fidgety and mood sad.  His grades and behavior were the same, but he had

not gotten in trouble at school in the past week.  R. 303.

On December 3, 2008, the Cajen clinician noted his mood was sad.  Concerta seemed to be

helping his anger, but it did not help his focus.  His problems were causing trouble with his extended

family.  He was failing classes, so he was unable to play sports.  R. 302.

H. Quintana, M.D., a child/adolescent and forensic child psychiatrist at Cajen, referred MH

to Grant Butterbaugh, Ph.D., an associate professor at LSU, for a psychoeducational evaluation of

MH to determine his learning and psychosocial treatment needs.  On January 8, 2009, Dr.

Butterbaugh diagnosed him with learning disorder, developmental coordination disorder, ADHD,

oppositional defiant disorder, and mood/anxiety disorder.  He also recorded asthma and educational

problems.  He indicated that MH had an eligible Emotional/Behavioral Disorder.  He recommended:

(1) appropriate classroom placement and positive behavioral support plan; (2) consideration of

special education in mathematics and occupational therapy for graphic motor impairments; (3)

counseling and behavioral support services; (4) resources to prompt and reinforce use of

listening/reading comprehension, self-control, and study skills; (5) disability accommodations for

extra test-taking time, test-taking in a quiet room, access to a calculator and computer, copies of

classroom and lecture notes, and reduced homework; and (6) continued psychiatric medication and

8

family counseling.  R. 298-301 and 373-376.

On January 9 and 22, 2009, MH was seen by a clinician at Cajen.  He was very quiet and downcast with blunted effect and sad mood.  Weekly counseling was recommended.  Facts about childhood were reviewed with his parents.  He was scheduled for one-on-one counseling.  R. 296-97.  On January 27, 2009, Dr. Quintana at LSU Psychiatry performed a psychiatric evaluation.  R. 292-95.  He diagnosed MH with ADHD (Combine Type), ODD, and Dysthymia.  R. 294.  He recommended counseling, medication and school accommodations.  R. 295.  He also was seen by a clinician.  R. 290-91.

On February 12, 2009, the Cajen clinician reported that MH appeared happier, but had not been sleeping on Vyvanse.  R. 288.  Dr. Butterbaugh was to write a letter to the principal and the school social worker to ensure that MH received accommodations.  R. 288.  He was started on Methylin (Ritalin) chewable tablet 10 mg three times a day.  R. 287.  On February 12, 2009, the Cajen clinician noted that MH was very quiet with blunted affect and sad mood.  A school social worker called to report that MH discussed his sadness with her after acting out in school.  R. 286.  On February 27, 2009, Ms. Hodges forgot an appointment.  R. 285.

On March 5, 2009, the Cajen clinician reported that MH began receiving special education instruction and social work services at school.  R. 283-84.  He appeared very tired.  He had a blunted affect and sad mood.  R. 284.  On March 6, 2009, Dr. Butterbaugh contacted his school to determine what special education accommodations had been set up and recommend an Invidualized Education Program with accommodations for math and reading and a behavior plan.  R. 281 and 284.  Ms. Hodges was notified that Dr. Butterbaugh contacted the school.  R. 280.

On March 11, 2009, MH reported that he had four teachers, things were better and he was

getting help.  R. 278-79  The Cajen clinician noted that he had a blunted affect and sad mood, though less so, and his stepfather reported that he had been more agreeable during the past week. R. 278.  On March 17, 2009, the Cajen clinician noted that MH was doing much better with school accommodations and social work therapy.  R. 277.  On March 18, 2009, the Cajen clinician noted that MH's affect was blunted.  He appeared distracted and fatigued.  He had received an award coupon at school for a free snowball.  His siblings were at the session with him.  He seemed happy to be with them.  R. 276.

On April 6, 2009, MH missed an appointment.  R. 275.  On April 29, 2009, MH reported that he had As, Bs and Cs on his most recent report card.  R. 274.  On May 7, 2009, MH was seen at Cajen.  He reported receiving a detention at school the previous week.  His affect was blunted and his mood was sad and downcast.  R. 273.

On May 11, 2009, Dr. Quintana increased his Methylin to 40 mg.  Dr. Quintana recorded that MH had done well.  There were no major behavior problems.  There was no change in appetite. There were no problems with sleep.  He was eating and sleeping well.  He was going to a summer camp.  He was to return in one month.  R. 272.

On May 12, 2009, he participated in group therapy at LSU Psychiatry.  While he did well in therapy, it was noted that his behavioral issues had increased recently, so continued counseling was recommended during the summer.  R. 366.

On May 20, 2009, the Cajen clinician reported that MH appeared calm and somewhat sad. It was noted that he took his medication, he brought his grades up and he was cooperative at home. R. 271.  On June 12, 2009, the Cajen clinician reported that MH was acting responsibly and with less anger and impulsivity.  He was in summer school to help him pass the LEAP test and was on

10

his church drill team.  R. 270.

On July 9, 2009, Dr. Quintana changed MH's medication to Adderall XR 20 mg.  It was noted that he went to summer school because he failed the LEAP test.  MH was doing better but there was an incident on a school bus and he got in trouble.  MH claimed that someone else damaged the seat on the bus.  His family had to pay for the seat.  He appeared slightly downcast with a blunted affect and sad mood.  R. 268-69.  On July 22, 2009, MH attended a group therapy session at Cajen.  It was noted that he was well-mannered and helpful and enjoyed physical activities.  There was a follow-up concern that he was falling into a pattern of competing for attention of peers.  R. 267.

**d.** **School Records**.

### 2007/2008 School Year - Fourth Grade for MH

On about October 12, 2007, the New Orleans Free Academy issued a notice that MH was suspended for one day on October 15, 2007 because of his participation in a food fight.  It was noted that he told the truth.  R. 238.

On November 2, 2007, MH was referred for discipline.  The most intrusive behavior problems were: (a) defiance and disrespect; (b) disruption; (c) abusive and inappropriate language; and (d) defiance, disrespect and insubordination.  R. 237.  On November 8, 2007, MH was referred for discipline with similar behavior problems.  In addition, it was reported that he became angry when he was told to move his desk to its original location.  R. 236.  On November 12 and 15, 2007, MH was referred for discipline.  R. 234-35.  On October 12 and November 8, 12 and 15, discipline incidents were recorded on a report.  R. 231-32.

On November 16, 2007, Natasha Roberson, the fourth grade teacher for all academic subjects

11

for MH completed a questionnaire.  R. 101-08.  For acquiring and using information, she rated all but two of the ten activities as either no problem or slight problem.  Serious problems were recorded for reading and comprehending written material and expressing ideas in written form.  R. 102.  She reported that MH had very serious problems in four activities associated with attending and completing tasks.  R. 103.  She noted that he had a very serious problem in one activity (respecting and obeying adults in authority) associated with interacting and relating with others.  R. 104.  She did not report any problems in moving about and manipulating objects.  R. 105.  She described him as able to care for himself, but reported that he did not express his emotional needs well.  R. 106.

On December 11, 2007, Ms. Hodges signed a statement acknowledging her understanding of a discipline management plan.  R. 241.  On December 12, 2007, Ms. Roberson completed a Vanderbilt assessment.  She indicated that some of the symptoms occurred very often.  For example, she indicated that he very often left his seat in the classroom or in other situations when he was expected to remain seated.  R. 199.  On December 13 and January 7, 2008, a Vanderbilt assessment was completed by Ms. Hodges.  MH was not on medication.  She indicated that most of the symptoms occurred very often.  For example, she indicted that MH talked too much and blamed others for his mistakes or misbehaviors.  R. 198, 239 and 240.

On April 2, 2008, the school requested Ms. Hodges' permission to conduct a 504 Review/Assessment because of a history of behavior problems.  R. 227-228.  It was reported that MH appeared to be responding to medication as he was not demonstrating behavior concerns at that time.  The plan was to be reviewed in one year.  R. 229.  Accommodations were needed because of his ADHD.  R. 230.

<u>2008/2009 School Year - Fourth Grade for MH</u>

The Jefferson Parish Public School System moved MH to Hazel Park Elementary for special education services.  R. 352.  He repeated the fourth grade.  R. 373.

Hazel Park reported discipline incidents on September 10 (MH in a fight ), September 23 (he hit a student), September 24 (he was continuously disruptive), September 25 and October 10 (he failed to serve detention), October 13 (he punched another student), October 20 (he refused to do any classwork in the afternoon class), and February 3 (he was disruptive over the course of a few weeks).  R. 358-60 and 380-81.

On November 12, 2008, MH's math teacher, Denise Lulei, completed a teacher questionnaire.  R. 133-140.  For acquiring and using information and attending and completing tasks, she did not rate any activity as a serious or very serious problem. R. 134-35.  For interacting and relating with others, she rated six activities as a serious problem but none were rated as very serious.  For example, there were serious problems with following rules and obeying adults in authority.  R. 136.  The teacher noted that MH's behavior changed drastically when he was not taking his medication.  R. 138.  When he took his medication, he did not demonstrate behavior concerns.  She commented that he received accommodations through a 504 Plan for ADHD. R. 139.

On January 13, 2009, MH was required to leave a class for thirty minutes because of disruptive behavior.  R. 363.  On January 15, 2009, Ms. Hodges was notified of the issuance of the January 13, 2009 report on disruptive behavior.  R. 362.  On January 26, 2009, Ms. Hodges was notified that MH would serve a period of detention on January 29, 2009.  R. 361.  On January 27, 2009, Ms. Hodges completed a report on the frequency of the occurrence of symptoms.  R. 393.

A notice of suspension was issued on February 4, 2009.  Ms. Lulei reported on February 3,

2009 that MH was disturbing the class on a daily basis.  He was suspended for two days on February 5 and 6, 2009.  R. 379 and 394-95.  On February 4, 2009, Ms. Lulei completed a form in which she indicated that almost all of the symptoms identified on the form occurred very frequently for MH.  R. 392.  On February 16, 2009, Ms. Hodges was notified that MH would be evaluated by the LSU Department of Psychiatry.  R. 371.  On February 16, 2009, the school system submitted a request for an evaluation.  R. 372.  On February 19, 2009, MH was suspended for disrupting school activities, disobeying school rules and refusing to follow instructions.  He shouted and laughed at other students.  R. 364.

On March 5, 2009, Ms. Hodges was notified of what was required for MH to have an inhaler at school.  R. 328, 332.  On that same date a meeting was scheduled with Ms. Hodges to discuss an Individualized Education Program for MH.  R. 335-42.  It was noted that MH was failing reading in the regular education setting.  The Woodcock-Johnson test showed that he had strength in reading fluency but a weakness in word attack.  R. 343.  Goals were set for his behavior, for example being able to comply with classroom rules without anger outbursts for eighty percent of the day.  R. 344 and 345.  He was failing in English in the regular education setting.  He had difficulty completing assignments.  Writing was a strength on the Woodcock-Johnson test.  R. 346.  He was failing in math.  His Woodcock-Johnson scores indicated a strength in math fluency but a weakness in calculation skills.  R. 347.  He was failing in science.  He enjoyed it, but his behavior interfered with his ability to succeed.  R. 348.  He was referred for speech/language screening.  R. 353.

On April 27, 2009, MH was given detention because he was caught for the third time sneaking water without permission.  R. 370.  On May 4, 2009, he was given detention for not bringing supplies and books to class.  He harassed another student and disrupted the class.  R. 369.

14

On May 12, 2009, one of MH's teachers noted that he had a great day.  R. 331.

MH did not pass the LEAP test.  R. 367-68.

On May 28, 2009 the school psychologist issued a report on the March 5, 2009 evaluation.

MH possessed the academic skills to do satisfactory work in school.  R. 316-320.  His poor grades

suggested that behavior and medical factors detrimentally impacted his academic performance.  R.

321.

MH had fourteen absences in the first term, twenty-one in the second term, and twenty-one

in the third term. R. 147 and 382.

2009/2010 School Year - Fifth Grade for MH

On September 1, 2009, an Individualized Education Program was completed for MH.  He

qualified for special education and for social work services.  R. 169.  The report stated,

> [A]ccording to the 08-09 report card grades, [MH] made academic progress in the
> general education setting, however, his inappropriate social and behavioral problems
> have hindered complete academic success.  These inappropriate behaviors have
> affected his ability to learn in the general education setting without the constant
> supervision of an adult.  He was currently making progress, but he was lacking
> appropriate social skills when participating in group assignments.

R. 169.  MH was provided accommodations including preferential seating, small group instruction,

read class materials orally, use of a calculator, modify/repeat/model directions, increased time for

assignments and tests, breaks during work periods, between tasks, and during testing, and tests read

aloud.  R. 175.

**e.**     **Analysis.**

**Issue No. 1.**     Did the ALJ err in failing to find that MH's condition met or equaled a listing?

MH argues that: (1) pursuant to Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007), the ALJ

was required to explain his conclusion that MH's impairments were not sufficiently severe to meet

15

any listed impairment; (2) the ALJ's summary conclusion was insufficient; (3) the error was not

harmless; and (4) the evidence establishes that MH meets Listing 112.11.

In Audler v. Astrue, 501 F.3d 446 (5th Cir. 2007), the Fifth Circuit stated,

> At step three, the ALJ summarily concluded that . . . (the claimant's impairments are) not severe enough to meet or medically equal one of the impairments listed. . . .  The ALJ did not identify the listed impairment for which Audler's symptoms fail to qualify, nor did she provide any explanation as to how she reached the conclusion that Audler's symptoms are insufficiently severe to meet any listed impairment.  Such a bare conclusion is beyond meaningful judicial review.

> *   *   *

> By the explicit terms of the statute, the ALJ was required to discuss the evidence offered in support of Audler's claim for disability and to explain why she found Audler not to be disabled at that step.  Although the ALJ is not always required to do an exhaustive point-by-point discussion, in this case, the ALJ offered nothing to support her conclusion at this step and because she did not, we, as a reviewing court, simply cannot tell whether her decision is based on substantial evidence or not.

> Having determined that the ALJ erred in failing to state any reason for her adverse determination at step 3, we must still determine whether this error was harmless.  Procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected.

501 F.3d at 448 (citations omitted).  Here, the Commissioner assumes that the ALJ erred in not

thoroughly discussing Listing 112.11, so it is unnecessary to determine whether the ALJ's analysis

at step three was sufficient.[3]  The issue is whether the error was harmless.

Attention Deficit Hyperactivity Disorder is manifested by developmentally inappropriate

degrees of inattention, impulsiveness, and hyperactivity.  20 C.F.R. Pt. 404, Subpt. P. Appendix 1,

Listing 112.11.  To meet the required level of severity there must be medically documented findings

---

[3]  The ALJ cited Audler and stated that he considered the claimant's mental impairment under Listing 103.03 and Listing 112.11.  R. 15.  Thus, part of the information required by Audler was provided.

of marked inattention.  112.11A.1.[4]

The Commissioner contends that: (1) the ALJ discussed at length why MH was not markedly impaired in the domain of attending and completing tasks; and (2) the evidence supports the determination that MH was not markedly impaired in his capacity to focus attention.  Rec. doc. 13 at 6-7.  MH argues that the evidence demonstrates inappropriate degrees of inattention and very serious and very frequent problems with inattention which required medication.  He contends that this satisfies the requirement for medically documented findings of marked inattention.

For the domain of attending and completing tasks, the ALJ is required to consider how well a claimant is able to focus and maintain attention.  20 C.F.R. 416.926a.  The ALJ found that MH had a less than marked limitation in attending and completing tasks.  R. 20 and 21.  Therefore, he found that MH was not markedly impaired in his capacity to focus attention.  If there is substantial evidence for the finding that MH had a less than marked limitation in attending and completing tasks, it follows that: (1) he did not meet Listing 112.11; and (2) the failure of the ALJ to discuss thoroughly Listing 112.11 was harmless error.  The issue of whether there is substantial evidence for the finding is considered below.

**Issue No. 2.**     Did the ALJ err in failing to find a marked impairment in the domain of attending and completing tasks.

MH contends that: (1) the ALJ's discussion of the evidence contained several factual mistakes; (2) the remaining evidence cited by the ALJ is contrary to his finding and in fact supports a finding of marked limitation in attending and completing tasks; and (3) the uncontroverted evidence is sufficient for the Court to rule that MH is disabled.  Rec. doc. 12 (memorandum at 21-

---

[4] There also must be: (a) medically documented findings of marked impulsiveness and marked hyperactivity; and (b) at least two of the appropriate age-group criteria in paragraph B.2. of 112.02.  See 112.11A and B.

25).  The Commissioner responds that: (1) MH's disability is determined from November 5, 2008, the date of the application, through November 3, 2009, the date of the ALJ's decision; (2) although earlier evidence casts some light on MH's medical history, it cannot establish disability during the relevant period; (3) the ALJ's evaluation and discussion of the evidence supports the conclusion that the ALJ considered the whole child, including medication and accommodations in determining MH's mental status; and (4) the ALJ's conclusion with respect to the domain of attending to and completing tasks is reasonable and supported by substantial evidence.  The Commissioner notes that even if other conclusions are permissible, the ALJ is entitled to make any finding that is supported by substantial evidence.  Arkansas v. Oklahoma, 112 S.Ct. at 1060.

The ALJ stated that: (1) pursuant to 20 C.F.R. 416.924a(a) and SSR 09-2p, he considered all of the relevant evidence in the case record; (2) pursuant to 20 C.F.R. 416.926a(b) and (c) and SSR 09-1p, he evaluated the whole child in making findings regarding functional equivalence; and (3) he considered all symptoms and the opinions of experts as required by the regulations.  R. 15 and 16.  He found that MH and Ms. Hodges were only generally credible.  R. 18.  He found that MH had a marked limitation with regard to interacting and relating with others.  R. 22.  He found less than marked limitations as to the other five domains, including the domain of attending to and completing tasks.

The issue raised by MH concerns the finding of less than marked limitation for the domain of attending and completing tasks.  The ALJ described what is to be considered under the domain; for example, the ability to avoid impulsive thinking.  R. 20.  He cited what the Social Security rules provide that a school-age child without an impairment should be able to do; for example, change activities or routines without distraction.  He cited examples of the difficulty children could have

18

in attending and completing tasks.  R. 21.  The ALJ noted that: (1) MH was followed with ADHD medications with some resolution of symptoms; (2) he performed better with medication according to a teacher; (3) during the 08/09 school year, he was granted interim placement in special education due to significant behavioral problems at school; (4) he qualified for social services at school; (5) his evaluations demonstrated strengths in some subjects and weaknesses in others; and (6) accommodations were present.  R. 21.

  A. The ALJ's alleged factual mistakes.

  MH contends that there are factual mistakes in the ALJ's discussion of the evidence.  The first concerns a May 12, 2009 report by a social worker.  R. 366.  The ALJ states:

> A Social Work Progress note for the third and fourth 9-weeks of school year shows that the claimant was very polite and cooperative in group therapy.  He interacted positively with his peers.  He continued to do well in group therapy.  His behavioral issues had decreased.

R. 18.  The ALJ's description of the May 12, 2009 report is correct except for the last sentence.  The last part of the report states, "[l]ately behavioral issues have increased.  He may benefit from continued counseling during the summer."  R. 366 (emphasis added).  The mistake does not warrant the relief sought by MH.  Before and after this report there are reports by the Cajean clinicians indicating that MH was doing better with school accommodations and social work therapy (March 17, 2009-R. 277) and he was acting responsibly and with less anger and impulsivity (June 12, 2009-R. 270).

  The second assertion of a mistake refers to the Cajen records.  The ALJ states:

> Progress notes from . . . [Cajen] beginning on November 14, 2008 to July 22, 2009 resemble his school records in that initially the claimant had significant behaviors. However, after several months of therapy, notes show the claimant did much better.

R. 18.  MH argues that the record reveals discussion of one improved report card, followed by

failure of the LEAP test, a need for summer school, and continued behavioral problems. Rec. doc. 12 (memorandum at 21). The ALJ was not describing the school records. His description of the Cajen records is accurate.

On November 4, 2008, MH was seen at Children's Hospital. It was noted that he was taking 36 mg. of Concerta. R. 200. He began going to Cajen on November 14, 2008. R. 304-313. On November 21, the Concerta was increased to 54 mg. His behavior was hyper and fidgety and his mood was sad. R. 303. On January 27, 2009, Dr. Quintana changed MH from Concerta to Vyvanse. R. 291. Because he was not sleeping on Vyvanse, he was started on Methylin (Ritalin) on February 12, 2009. R. 287-88. On May 11, 2009, Dr. Quintana increased the Methylin. He recorded that MH had done well. There were no major behavior problems, no change in appetite, and no problems with sleep. He was eating and sleeping well. R. 272. On July 9, 2009, Dr. Quintana changed MH's medication to Adderall XR 20 mg. He was doing better, but the vandalism incident was discussed. R. 268-69. The failure of the LEAP test was noted. On July 22, 2009, the group therapy session noted that he was well-mannered and helpful and enjoyed physical activities. R. 267. The ALJ did not mis-characterize the Cajen records. They showed improvement after therapy and changes in his medication.

The third assertion of a mistake concerns the ALJ's statement that, "[h]e performs better with medications according to his teacher." R. 21. The ALJ cites a statement by Ms. Lulei on November 12, 2008 on the portion of a questionnaire concerned with attending and completing tasks. She added, "[w]hen he takes his medication, he performs better." R. 135.

On January 7, 2008, MH was evaluated by Thomas Welsch, Ph.D., who reported that even though MH had taken his medication for ADHD on the day of testing, problems with attention were

noted.   The pertinent period for the determination of disability begins with the filing of the application on November 5, 2008.   The evaluation by Dr. Welsh was ten months earlier.   The ALJ does not misstate Ms. Lulei's November 12, 2008 comment that when he took his medication, he performed better.

On February 4, 2009, Ms. Lulei completed a questionnaire and indicated that for all but three of the problems identified on the questionnaire, they occurred very often or very frequently.   R. 392.   The response to the questionnaire is silent about the effect of medication on MH's behavior.   Just before Ms. Lulei completed the February 4, 2009 questionnaire, MH's medication was changed from Concerta to Vyvanse.   R. 291.   Eight days after Ms. Lulei completed the questionnaire, the medication was changed from Vyvanse to Methylin (Ritalin).   This was done because he was not sleeping on Vyvanse.   R. 287-88.   Ms. Lulei completed the February 4, 2009 questionnaire at a time when MH's medication was being changed and the medication was preventing him from sleeping.   Once Methylin was prescribed and the dosage increased, Dr. Quintana confirmed that he was doing well (May 11, 2009-R. 272).   There is substantial evidence for the statement that MH performed better with medication.

MH contends that the ALJ did not follow SSR 09-2p and improperly found that medication, group therapy, social work intervention, and school accommodations caused improvement in MH's functioning, and that his limitations were not as severe as alleged.   SSR 09-2p is concerned with determining childhood disability, documenting a child's impairments, and related limitations.   The ruling notes that an Individualized Education Program is an important source of information about a child's abilities as it will describe the support a child receives.   SSR 09-2p states:

> This information about supports children receive can be critical to determining the
> extent to which their impairments compromise their ability to independently initiate,

21

sustain, and complete activities.  In general, if a child needs a person, a structured or supportive setting, medication, treatment, or a device to improve or enable functioning, the child will not be as independent as same-aged peers who do not have impairments.  We will generally find that such a child has a limitation, even if the child is functioning well with the help or support.  The more help or support of any kind that a child receives beyond what would be expected for children the same age without impairments, the less independently the child functions, and the more severe we will find the limitation to be.[5]

R. 15.  He found that MH had an impairment.  The Ruling does not mandate a finding of disability if the child is functioning with help or support nor does it provide  that for a given level of support, a finding of disability is required.  Instead, it provides that the more help or support received by a child, the less independently the child functions and the more severe the Commissioner will find the limitation to be.

The ALJ found that MH and Ms. Hodges were not generally credible to the extent they alleged impairments so severe as to preclude the performance of all functional activity.  R. 18.  The ALJ stated that "[a]lthough the claimant experienced some mental and social difficulties, the records indicate he made progress with appropriate treatment, including medications, group therapy, social work interventions, and school accommodations.  R. 18.  The record substantiates the ALJ's finding.  Dr. Quintana's notes reflect progress as the medication and dosage was changed.  R. 272.  On March 17, 2009, the Cajen clinician noted that MH was doing much better with school accommodations and social work therapy.  R. 277.  On June 12, 2009, the Cajen clinician noted that MH was acting responsibly and with less anger and impulsivity.  R. 270.  MH's argument regarding SSR 96-02 misstates the Ruling and ignores the presence of substantial evidence for the ALJ's finding.

The next alleged mistake concerns the relationship between the findings supporting a marked

_____

[5] SSR 09-2p: Title XVI: Determining Childhood Disability – Documenting a Child's Impairment-Related Limitations, Effective Date: March 20, 2009, Publication Date: February 18, 2009, Federal Register Vol. 74, No. 30, page 7525; and www.ssa.gov/OP_Home/rulings/ssi/02/SSR2009-02-ssi-02.html

limitation in interacting and relating with others and the findings supporting a less than marked limitation in attending and completing tasks.  The ALJ described what the domain of interacting and relating with others considers and what the rules provide that a child without an impairment should be able to do. R. 21.  He cited examples of the difficulty that a child could have in interacting and relating with others.  He found that MH had a marked limitation in this domain and cited: (1) multiple suspensions for fighting and disrupting class; (2) he became oppositional when he did not get his way; (3) he tried to leave the classroom; (4) his behavior changed drastically when he was not on his medication; (5) his inappropriate behavior hindered complete academic success; (6) he needed constant supervision to learn in a general education setting; and (7) he lacked appropriate social skills to participate in group assignments.  The ALJ concluded that his poor grades suggested that behavioral and medical factors detrimentally impacted his academic performance.

MH contends that the ALJ was required to consider these impairments not only for the domain of interacting and relating with others, but also the domain of attending and completing tasks.  The ALJ referred to the appropriate regulation in describing what is considered in the domain of interacting and relating with others (20 C.F.R. 416.926a(i)), the correct expectations for a child of ten (id. at 416.926a(i)(2)(iv)), and the appropriate examples of limited functioning in interacting and relating with others (Id. at 416.926a(i)(3)).  R. 21-22.

Pursuant to SSR 09-01, the "whole child" approach is used for determining whether a child's impairments functionally equal the listing.  The ALJ stated that he evaluated the "whole child" in making findings regarding functional equivalence.  R. 16.  SSR 09-01 states:

> The "whole child" approach recognizes that many activities require the use of more than one of the abilities described in the first five domains, and that they may also be affected by a problem that we consider in the sixth domain.  A single impairment, as well as a combination of impairments, may result in limitations that require

23

evaluation in more than one domain.  Conversely, a combination of impairments, as well as a single impairment, may result in limitations that we rate in only one domain.

Therefore, it is incorrect to assume that the effects of a particular medical impairment must be rated in only one domain or that a combination of impairments must always be rated in several.  Rather, adjudicators must consider the particular effects of a child's impairment(s) on the child's activities in any and all of the domains that the child uses to do those activities, based on the evidence in the case record.[6]

The attending and completing tasks domain considers how well a child is able to focus and maintain attention.  The ALJ discussed the effects of MH's impairments and responses to them, for example accommodations and his strengths in reading, writing and math fluency.  R. 21.  For interacting and relating with others, the ALJ considered other areas of MH's functioning.  For example, he cited multiple suspensions for fighting.  MH has not demonstrated that the ALJ was required to consider this behavior problem in conjunction with how well he was able to focus and maintain attention.  SSR 09-01 does not require that a combination of impairments must always be considered in several domains.

MH's last alleged mistaken factual finding concerns the ALJ's citation to a December 30, 2008 opinion.  Before considering each of the domains, the ALJ reported that he had considered all of the relevant evidence in the case record.  R. 15.  He discussed information from Ms. Hodges, MH's teachers, school records, Dr. Butterbaugh's psychoeducational evaluation, the report by the psychologist, Dr. Welsh, and the Cajen records.  R. 16-19.  In addition to this evidence, he referred to the guidelines in SSR 96-6P.  The Ruling provides that: (1) findings by State agency psychological consultants must be treated as expert opinion evidence of nonexamining sources at

---

[6]  SSR 09-1p: Title XVI: Determining Childhood Disability Under the Functional Equivalence Rule — The "Whole Child" Approach, Effective Date: March 19, 2009, Publication Date: February 17, 2009, Federal Register Vol. 74, No. 30, page 752 (emphasis added), and http://www.ssa.gov/OP_Home/rulings/ssi/02/SSR2009-01-ssi-02.html

the ALJ level of administrative review; (2) the ALJ may not ignore these opinions; (3) the ALJ must explain the weight given to them; and (4) updated opinions must be obtained before a decision of disability based on medical equivalence can be made. 1996 WL 37418, *1 (S.S.A.).  The Ruling adds that such opinions can be given weight only insofar as they are supported by evidence in the case record.  Id. at *2.  The ALJ stated that he considered the medical opinions of non-examining sources, including a report dated December 30, 2008 and signed by two non-examining psychologists.  R. 255-260.  They found that MH had a less than marked limitation in acquiring and using information and attending and completing tasks and marked limitation in interacting and relating with others.  The ALJ stated "[b]ased on the discussion herein, I totally agree with the non-examining State medical consultant and find the claimant not disabled."  R. 19.  The ALJ then made findings for each of the six domains.  R. 19-24.

MH objects that: (1) the December 30, 2008 opinion was rendered prior to much evidence of record, so it was not based on the record as a whole; (2) the ALJ is not permitted to accord controlling weight to the non-examining consultants' opinion; and (3) the ALJ failed to weigh the opinion against the opinions of MH's teachers and treating doctors and social workers.  MH ignores that SSR 96-9p requires the ALJ to consider the opinion.  Such findings "must be treated as expert opinion evidence" and the ALJ "may not ignore these opinions. . . ."  Id. at *1.  The question is whether the ALJ gave the opinion controlling weight.  The ALJ only considered the opinion after discussing all of the other relevant record evidence.  Based on the ALJ's discussion of the evidence, he agreed with the opinion.  R. 19.  The ALJ's decision does not demonstrate that he gave the opinion controlling weight.

B.    Substantial evidence supports the finding of a less than marked limitation in attending and completing tasks.[7]

MH filed his application for benefits on November 5, 2008.  R.87-89.  The teacher questionnaire completed by Denise Lulei a week after the application on November 12, 2008 is an appropriate starting point for the question of whether there is substantial evidence for the ALJ's finding that MH had a less than marked limitation in attending and completing tasks.

For the domain of attending and completing tasks, Ms. Lulei did not rate any activity as a serious or very serious problem.  R. 135.  At that point she had known MH for three months; she saw him for an hour each school day; and she taught him math.  R. 133.  Ms. Lulei's report is evidence in support of the ALJ's finding.  Because the report comes at the very beginning of the relevant

---

[7] The Commissioner's brief on the issue of whether there is substantial evidence to support the ALJ's finding that MH had a less than marked limitation in attending and completing tasks evidences a lack of attention to the record by the counsel for the Commissioner.  In the first paragraph of page 8 of Commissioner's memorandum, counsel refers to a November 12, 2008 report by K. Wilbert, MH's teacher.  Counsel cites to pages 133 and 135 in the record.  The list of exhibits refers to Exhibit 7E-Teacher Questionnaire, dated November 12, 2008 from Hazel Park School.  This is an eight page questionnaire.  R. 133-140.  The instructions for the form requested that it be completed by the person most familiar with the child's overall functioning.  The form is signed by Denise Lulei and dated November 12, 2008.  R. 140.  There is no reference to K. Wilbert.  With respect to attending and completing tasks, Ms. Lulei indicates none of the activities within that domain present serious or very serious problems.  She also notes that when MH takes medication, he performs better.

If the reference to K. Wilbert rather than Denise Lulei were the only problem, it would not be worthy of mention.  However, counsel for Commissioner compounds the problem.  On page 10, counsel for Commissioner states,

In direct contradiction of Ms. Wilbert's 2008 report, another teacher's evaluation indicated Plaintiff exhibited marked or extreme limitations in virtually every domain (Tr. 392-393).  There is no explanation provided concerning this extreme and unsupported rating that appears to be highly inconsistent with the remainder of the record.

Rec. doc. 13 at 10.  R. 392 refers to form headed "Conners' Teacher Rating Scale - Revised."  It is dated February 4, 2009 and the teacher completing it is "D. Lulei."  To summarize, counsel for the Commissioner contends that a November 12, 2008 teacher questionnaire completed by Denise Lulei provides evidence that MH is not disabled, but a February 4, 2009 report completed by Denise Lulei should be ignored as highly inconsistent with the remainder of the record.

period for determination of disability, it establishes a base line from which to consider other evidence.  The issue of medication is important.  Ms. Lulei reported that when MH took his medication, he performed better and his behavior changed drastically when he did not take his medication.  R. 135 and 138.

On November 21, 2008, MH was seen at Cajen and the Concerta was increased to 54 mg. On December 3, 2008, the Cajen clinician noted that MH's mood was sad.  Concerta seemed to be helping his anger, but it did not help his focus.  R. 302.  On January 8, 2009, MH was seen by Dr. Butterbaugh, who recommended accommodations.  R. 298-301.  On January 8 and 22, 2009, MH was seen at Cajen.  He was very quiet and downcast with blunted effect and a sad mood.  R. 296-97. On January 27, 2009, Dr. Quintana changed his medication and put him on Vyvanse.  R. 291.

In January and February, MH experienced problems at school (January 13 - disruptive behavior and required to leave class [R. 363]; January 29 - required to serve detention [R. 361]; February 3 - Ms. Lulei reported that he was disturbing the class on a daily basis [R. 379]; and February 5 and 6 - suspended for two days [R. 394-95]).  On February 4, 2009, Ms. Lulei completed the questionnaire in which she indicated that almost all of the symptoms identified on the form occurred very frequently.  R. 392.  Between November 12, 2008 and February 4, 2009, the situation changed.  On February 12, 2009, Cajen reported that MH appeared happier, but he was not sleeping with the Vyvanse.  R. 288.  He was taken off of Vyvanse and started on Methylin (Ritalin).  R. 287.

On March 6, 2009, Dr. Butterbaugh contacted his school to determine what special education accommodations had been set up and recommend an Invidualized Education Program ("IEP") with accommodations for math and reading and a behavior plan.  R. 281.  On March 11, 2009, MH reported that he had four teachers, things were better and he was getting help.  R. 278-79  On March

17, 2009, the Cajen clinician noted that MH was doing much better with school accommodations and social work therapy.  R. 277.  On March 18, 2009, the Cajen clinician recorded that MH had received an award coupon at school for a free snowball.  R. 276.

On May 11, 2009, Dr. Quintana increased his Methylin to 40 mg.  Dr. Quintana recorded that MH had done well.  There were no major behavior problems.  There was no change in appetite. There were no problems with sleep.  He was eating and sleeping well.  He was going to a summer camp.  R. 272.  On May 20, 2009, the Cajen clinician reported that MH appeared calm and somewhat sad.  It was noted that he took his medication, he brought his grades up and he was cooperative at home.  R. 271.  On June 12, 2009, the Cajen clinician reported that MH was acting responsibly and with less anger and impulsivity.  He was in summer school to help him pass the LEAP and was on his church drill team.  R. 270.

On July 9, 2009, Dr. Quintana changed MH's medication to Adderall XR 20 mg.  It was noted that he went to summer school because he failed the LEAP test.  R. 268-69.  On July 22, 2009, MH attended a group therapy session at Cajen.  It was noted that he was well-mannered and helpful and enjoyed physical activities.  There was a follow-up concern that he was falling into a pattern of competing for attention of peers.  R. 267.

On September 1, 2009, there was a meeting with participation from MH's special education teacher, his regular education teacher and others.  An IEP form was completed.  R. 169-78.  It was noted that for the 2008/2009 school year MH made progress in the general education setting, but his behavioral problems hindered complete academic success.  R. 169.

The November 12, 2008 questionnaire completed by Ms. Lulei and the September 1, 2009 IEP confirm that MH had less than a marked limitation in attending and completing tasks.  Shortly

after the November 12, 2008 questionnaire, Dr. Quintana increased the Concerta dosage, but it did

not help his focus.  R. 302-303.  On January 27, Dr. Quintana changed the medication to Vyanse,

but MH could not sleep.  R. 288 and 291.  MH did not begin to improve until his medication was

changed again to Methylin and that dosage was later increased.   R. 272 and 287.  The increased

behavior problems at school in January and February occurred at the time that MH was undergoing

several changes in his medication, including one which prevented him from sleeping.

Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.  Richardson, 91 S.Ct. at 1427.  A finding of no substantial evidence is

appropriate only if no credible evidentiary choices or medical findings support the decision.

Johnson, 864 at 343-44.  There is substantial evidence to support the ALJ's conclusion that MH had

a less than marked limitation in attending and completing tasks.  MH's appeal is a request that the

Court reweigh the evidence and substitute its judgment for the Commissioner's.  The Court is not

permitted to do this.  Audler, 501 F.3d at 447.

### RECOMMENDATION

Accordingly, IT IS RECOMMENDED that defendant's cross-motion for summary judgment

(Rec. doc. 13) be GRANTED and plaintiff's motion for summary judgment (Rec. doc. 12) be

DENIED and plaintiff's complaint be dismissed with prejudice.

### OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and

recommendations in a magistrate judge's report and recommendation within ten (10) days after being

served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal

the unobjected-to proposed factual findings and legal conclusions accepted by the district court,

29

provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 12th day of September, 2011.

**SALLY SHUSHAN**
**United States Magistrate Judge**